# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 11, 2001 Session

## STATE OF TENNESSEE v. WILLIE J. COWAN, JR.

**Direct Appeal from the Criminal Court for Shelby County**
**No. 99-12175     Chris Craft, Judge**

---

**No. W2000-03140-CCA-R3-CD - Filed May 14, 2002**

---

The Defendant was convicted by a Shelby County jury of vehicular homicide by intoxication and reckless driving. He received an effective sentence of nine and a half years in the Tennessee Department of Correction. The Defendant now appeals, arguing the following: (1) that insufficient evidence was presented at trial to convict him of the charged offenses and (2) that the trial court erred in sentencing the Defendant. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

William C. Gosnell, Memphis, Tennessee, for the Appellant, Willie J. Cowan, Jr.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Tibbetts, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On May 19, 1999, officers responded to an automobile accident in Memphis, Tennessee in which a Pontiac Firebird collided with a tree. Both occupants were ejected from the vehicle. The victim, Reginald Thomas, died. The Defendant, Willie J. Cowan, was charged with vehicular homicide by intoxication, vehicular homicide by reckless behavior, driving under the influence (DUI) due to intoxication, driving under the influence (DUI) while the alcohol concentration in his blood was .20 percent or more, and reckless driving.

A Shelby County jury convicted the Defendant on all counts. The trial court merged the vehicular homicide by reckless behavior into the conviction for vehicular homicide by intoxication. The two DUI convictions were also merged into the conviction for vehicular homicide by intoxication. The trial court sentenced the Defendant as a Range I, standard offender to nine and a

half years incarceration for the vehicular homicide conviction and to six months incarceration for the reckless driving conviction. The two sentences were to be served concurrently for an effective sentence of nine and a half years. The trial court also assessed a $10,000 fine for the vehicular homicide conviction and revoked the Defendant's driving privileges for eight years. The Defendant now appeals, arguing the following: (1) that insufficient evidence was presented at trial to convict him of the charged offenses and (2) that the trial court erred in sentencing the Defendant. Finding no error, we affirm the judgment of the trial court.

FACTS

Officer William Crawford of the Memphis Police Department testified that in May 1999, he was working with the Southeast Precinct as a uniform patrol officer. Crawford stated that he responded to a one-car accident on the corner of South Parkway and Castilia. At the scene, Crawford observed a black Pontiac Firebird "which was up off of the street just over the curb twisted up on the passenger side just before the intersection of Castilia which is right next to a large ditch and a stone wall." The parties stipulated that the Pontiac Firebird involved in the accident was registered to the Defendant's wife, Cheri Cowan.

Crawford testified that the Defendant was lying "in the actual intersection of Castilia and South Parkway" and that the victim's body was lying "by the brick wall" on Castilia. Crawford was asked to look at several photographs at trial in which he identified the tire marks he observed at the crash site. He noted that the tire marks indicated that the vehicle was "obviously" moving at a "high rate of speed" and that it began "to spin out of control." According to Crawford, the tracks indicated that the "vehicle continued to turn sideways spinning out of control and actually leaving the roadway going up over the curb and heading toward some trees which are over to the right."

Crawford stated that the car struck a tree and that the passenger side of the vehicle was "extensively crushed, showing heavy body damage." Crawford believed that the car must have been traveling at a high rate of speed and must have been "pretty high off the ground" when it struck the tree. The vehicle finally came to rest on the passenger side. Crawford recalled that "the thing that struck [sic] out the most to [him] besides the large amount of debris that was scattered everywhere was that the rear passenger tire was almost touching the dash of what would normally be the passenger front seat." Crawford testified regarding the driver's side that "there was not as much or nearly as much damage in comparison to the passenger side."

Sergeant James L. Wright testified that he is a member of the Special Traffic Investigations Squad of the Memphis Police Department. Sgt. Wright stated that his department investigates accident scenes and determines if charges need to be brought against anyone. Sgt. Wright elaborated on a supplemental diagram that he had drawn at the scene of the accident. Sgt. Wright stated that he was able to ascertain "through skid marks and the marks on the pavement and in the grass and the mark on the tree [] the path the car took prior to coming to rest." Sgt. Wright stated that by the time the vehicle hit the tree, "it had completely turned 180 degrees, and the right rear of the car struck the tree going pretty much in a backwards manner." Sgt. Wright recalled that the passenger

side of the vehicle was "fairly crushed," while the driver's side "sustained the least amount of damage."

Officer Thomas B. Evans testified that he is a member of the Metro DUI Squad of the Shelby County Sheriff's Department. Evans stated that he responded to the accident on May 19, 1999 and requested a blood test from the Defendant in order to determine his level of intoxication. Officer Lois Mitchell Bonds testified that she is a member of the Metro DUI Squad of the Memphis Police Department. Bonds testified that as part of her duties, she transported the Defendant's blood sample from a lockbox in her office to the University of Tennessee Toxicology Department and turned the sample over to Scott Fernandez. Gary Scott Fernandez testified that he is a supervisor of the drug screen section of the University of Tennessee Toxicology Laboratory. Fernandez testified that he received the Defendant's blood sample.

Steven Nichols testified that he is a supervisor at the University of Tennessee Toxicology Laboratory. Nichols testified that he is responsible for the flow of the samples through the solid dosage section and the blood alcohol quantitation section. Nichols stated that samples are submitted to the lab by local law enforcement agencies. Nichols testified that he performed the blood alcohol analysis in this case using a gas chromatic graphic system and determined that the blood sample in this case contained a blood alcohol level of .25 grams per deciliter. The lab report was entered into evidence.

Jessie James Smith testified that he and the victim had grown up in the same neighborhood and that he had known the victim "since he was young." Smith also stated that he knew the Defendant. Smith recalled that around 11:00 p.m. on May 18, 1999, he was at a liquor store on South Parkway. Smith stated that he was sure that it was 11:00 p.m. because the store was closing. Smith testified that after leaving the liquor store, he talked to some friends outside the store and then walked about two and a half blocks to a nearby MAPCO store to purchase some orange juice. Smith testified that he then left the MAPCO store and began walking towards "the club on South Parkway and Floyd" when he saw the Defendant standing in a telephone booth.

Smith testified that he was going to ask the Defendant for a ride, but the Defendant was on the phone. According to Smith, the driver's side door of the Pontiac was open. Smith testified that he walked to the passenger's side of the Defendant's black Pontiac, where the victim was sleeping, woke the victim, and began talking to the victim. Smith testified that after talking to the victim, Smith left and continued to walk to "the club." Smith recalled that he learned the next day that the victim had died.

Grover Odom testified that late on the evening of May 18, 1999, he was traveling down South Parkway when he noticed a Firebird merge from a side street. Odom testified, "[The car] came so close to me that I thought he was going to hit me, and when I looked over he wasn't directly beside me but he was a little ways up, I could still see the passenger." Odom testified that the passenger of the vehicle "threw a peace sign." Odom stated that he couldn't make out the passenger's face, but he said that the passenger had either "real short" hair or none at all. Odom also

testified that when he looked "where [the passenger's] mouth would be," he saw "a shine come like it was a gold tooth or something there, like he had a gold tooth in his mouth." When shown a picture of the victim, Odom stated, "Well, looks like . . . this is the head of the silhouette of the man on the passenger side." Odom also identified the Defendant's Firebird as the vehicle that he saw that evening. On cross-examination, Odom agreed that the Firebird had tinted windows.

Odom was sure that the Firebird "hit 100 miles per hour" at one point. Odom testified that the Firebird sped ahead and then it "started to veer and started to fishtail." Odom recalled that the Firebird turned to the side and hit the sidewalk, resulting in a large amount of "debris, dust, [and] glass." Odom stated that the car turned and then came to rest.

Smith Thomas testified that his son, the victim, was married to Barbara Thomas and that they had two children. Thomas stated that he owned a store and that the victim worked there before his death. Thomas testified that the victim lived in his neighborhood. Thomas identified a photograph of his son and testified that he had a gold tooth. Thomas recalled that about four or five years prior to the trial, he had given the victim a car; however, the victim had difficulty operating the car because it had a manual transmission. He testified that when the victim utilized the car to go to work in Tunica, Mississippi, he would ask others to drive the car. Thomas also testified that he knew the Defendant and that the last time he saw him, the Defendant was driving a Pontiac Firebird.

Doctor Cynthia Gardner testified that she was employed at the Regional Forensic Center as an Assistant Medical Examiner for Shelby County. Gardner stated that she performed an external examination on the victim. Gardner listed the cause of the victim's death as "multiple injuries, specifically the blood in the right side of the chest, the fractures, the evidence of trauma that was external[]." Gardner documented the victim's weight at the time of the examination as 164.5 pounds and testified that his blood alcohol level was .21 grams per deciliter. Although Gardner determined that the victim's injuries were sustained in an automobile accident, she was not able to ascertain where the victim was seated in the vehicle at the time of the accident.

Ricardo Thomas, the victim's first cousin, testified that the victim was "like a brother" to him and that he saw him everyday. Thomas recalled that the victim's father bought the victim a car a couple of years prior to the accident, but the victim had trouble driving it because it had a manual transmission. Thomas testified that he usually drove the victim's car. Thomas stated that he saw the victim on May 18, 1999, the day before he died. Thomas testified that he saw the Defendant on that same date and reported that the Defendant was driving a "big truck." Later that evening, Thomas saw the Defendant again, at which time the Defendant was driving a Firebird. Thomas testified that the Firebird had a manual transmission. According to Thomas, the Defendant was "pretty high, intoxicated," could "[b]arely could hold his head up and [was] running at a high rate of speed." Thomas testified that he offered to drive the Defendant's car home, but the Defendant "would not let [him]." Thomas recalled that the Defendant's son and his nephew's stepson were also in the car. Thomas said that it was very common for the victim to "throw a peace sign." Thomas also testified that at one time, the victim had a gold tooth, but Thomas was not sure if he had it at the time of the accident.

-4-

Rufus Webb, Jr., the victim's uncle, testified that he was with the victim all day on May 18, 1999. Webb testified that he also saw the Defendant on that same day. The Defendant gave Webb a ride to the store to get some cigarettes. Webb testified that the Defendant "was driving too fast" and was drinking Budweiser beer at the time. Webb stated that sometime between 6:00 and 8:00 p.m., the victim fell asleep on the couch, so Webb went into the bedroom to sleep. Webb testified that he did not see the victim alive again.

Darrell Williams testified that both the Defendant and the victim were childhood friends of his and that they all grew up in the same neighborhood. Williams testified that sometime between 4:00 and 5:00 p.m. on May 18, 1999, he saw the Defendant and the victim on Michigan Street. Williams further testified that he spent the next two and a half to three hours with the two men. Williams recalled that when he left the victim and the Defendant to go to another friend's house, the Defendant and the victim were "still standing on the sidewalk talking." After visiting his friend, Williams went back to "the neighborhood" and saw the Defendant's car parked in front of his nephew's house. Williams testified that he drove up next to the Defendant's car and saw both the Defendant and the victim asleep in the car. According to Williams, the victim was in the driver's seat, and the Defendant was in the passenger's seat. Williams testified that in 1999, the victim did not have a gold tooth. Williams also stated that he had seen the victim drive an automobile with a manual transmission.

Marvin Johnson testified that he is the Defendant's nephew and stated that he had known the victim since he was about ten years old. Johnson testified that on the morning of May 18, 1999, he saw the Defendant and the victim on Michigan Street. Johnson stated that the three men met later that afternoon when "it was just turning dark or had been dark just for awhile." Johnson testified that before they all met again, he and the victim "just drunk," and then the victim went to sleep at the home of Rufus Webb.

Johnson testified that at some point, he "went over [to] Mr. Webb's house and woke [the victim] up because [Johnson] wanted him to go home." Johnson stated that the victim got up, and all three men left. According to Johnson, the Defendant and the victim dropped Johnson off at his home. At that time, the Defendant was driving; however, Johnson testified that when they got to Johnson's house, the Defendant got out of the car to talk to a friend, and the victim got in the driver's seat. Johnson testified that he went into his house and did not see who was driving.

Johnson testified that the victim did not have a gold tooth on the date of the accident. Johnson also stated that the victim could operate a manual shift automobile. However, Johnson admitted that a few weeks before the accident, the victim had driven the Defendant's Firebird, but was not able to get on the interstate because he was having trouble operating the manual transmission.

ANALYSIS

**Sufficiency of the Evidence**

-5-

The Defendant argues that insufficient evidence was presented at trial to convict him of the charged offenses. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Sufficient evidence was presented at trial to convict the Defendant of vehicular homicide by intoxication, reckless driving, and driving under the influence. The Defendant's primary argument is that insufficient evidence was presented at trial to prove that he was driving the vehicle involved in the accident. Although both individuals were ejected from the vehicle, there is ample evidence to suggest that the Defendant was driving at the time of the accident. The Defendant's wife, Cheri Cowan, was the owner of the Firebird. Jessie James Smith testified that he saw both the victim and the Defendant around 11:00 p.m. on the evening of the accident. Smith stated that the victim was in the passenger seat and that the Defendant was talking on a pay phone. Grover Odom testified that he saw the Firebird minutes before the accident and identified the victim as the passenger of the vehicle. Several witnesses testified that the victim had trouble driving a manual shift car like the Firebird involved in this accident. Finally, Officer Crawford and Sgt. Wright both testified that the passenger's side of the vehicle was severely crushed, whereas, the driver's side of the vehicle sustained much less damage. Thus, there was sufficient evidence for a jury to determine that the Defendant was driving the Firebird at the time of the accident.

Having concluded that there was sufficient evidence for the jury to find that the Defendant was operating the vehicle at the time of the accident, we further conclude that there was sufficient evidence to find the Defendant guilty of the charged offenses. Vehicular homicide is defined, in relevant part, as "the reckless killing of another by operation of an automobile, airplane, motorboat or other motor vehicle: (1) [a]s the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person; or (2) [a]s the proximate result of the driver's intoxication as

set forth in § 55-10-401." Tenn. Code Ann. § 39-13-213(a). An analysis of the Defendant's blood immediately after the accident indicated that he had a blood alcohol level of .25 grams pers deciliter, more than twice the legal limit. See id. § 55-10-401(a)(2). In addition, evidence was also presented that immediately before the accident, the Defendant was driving at an excessive rate of speed. Grover Odom testified that he was sure that the Firebird "hit 100 miles per hour" at one point. Officer Crawford also testified that the Defendant was "obviously" traveling at a "high rate of speed" when the accident occurred. There was sufficient evidence for the jury to find that the Defendant was driving a vehicle while intoxicated, that the Defendant's intoxication and reckless behavior caused the accident, and that the victim died as a result of the Defendant's behavior.

### Sentencing

The Defendant argues that the trial court erred in sentencing him. The trial court sentenced the Defendant as a Range I standard offender to nine and a half years incarceration for the vehicular homicide conviction, a Class B felony in this case, see id. § 39-13-213(b), and ordered him to pay a fine in the amount of $10,000. A Range I sentence for a Class B felony is between eight and twelve years. Id. § 40-35-112(a)(2). The trial court sentenced the Defendant to six months incarceration for the reckless driving conviction, a Class B misdemeanor. See id. § 55-10-205(b). The two sentences were ordered to be served concurrently.

When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). Because the record in this case indicates that the trial court adequately considered the enhancement and mitigating factors as well as the underlying facts, our review is de novo with a presumption of correctness.

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present.

Tenn. Code Ann. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

The Defendant argues that the trial court erred in sentencing him to nine and a half years incarceration because he "is 35 years of age and has no significant criminal history and no prior criminal convictions." In addition, the Defendant argues that had he been sentenced to eight years incarceration, he would have been eligible for treatment for alcoholism or "some other form of correctional program." The Defendant has failed to show that the trial court improperly sentenced him.

> In sentencing the Defendant, the trial court applied the following enhancement factors:
> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
> . . . .
> (4) A victim of the offense was particularly vulnerable because of age or physical or mental disability . . . ;
> . . . .
> (8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community.

Tenn. Code Ann. § 40-35-114(1), (4), (8). The trial court did not find any mitigating factors. Based upon our review of the record, we conclude that the trial court properly declined to apply any mitigating factors in this case.

In considering applicable enhancement factors, the trial court stated that it gave a great deal of weight to enhancement factor (1), see id. § 40-35-114(1), "because of the nature of the convictions with this offense." The trial court found that the Defendant was previously convicted of failing to stop at the scene of an accident involving injury or death, of driving under the influence, and of driving on a revoked license. The trial court noted the similarity in the previous crimes and those involved in this appeal. The court stated that in both instances, the Defendant was "[a]ttempting to avoid responsibility for drunk driving where he was intoxicated and caused an accident." In finding that enhancement factor (8) applied, see id. § 40-35-114(8), the trial court stated that the Defendant had previously been given probation on a revoked license and "continued to drive anyway." The trial court also noted that the Defendant was convicted of possessing marijuana while he was on probation. We conclude that the trial court properly applied enhancement factors (1) and (8) in this case. See id. § 40-35-114(1), (8).

However, we conclude that the trial court improperly applied enhancement factor (4), that the victim was "particularly vulnerable." Id. § 40-35-114(4). The trial court applied enhancement factor (4), see id., because the victim was intoxicated at the time of the accident. A victim is particularly vulnerable if, due to physical or mental limitations, she or he is incapable of resisting, summoning help, or testifying against the perpetrator. See State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). This Court has held in several cases not involving the crime of vehicular homicide that a finding of extreme intoxication supports application of enhancement factor (4). See State. v. Billy Gene Earnest, No. 01C01-9412-CR-00434, 1996 Tenn. Crim. App. LEXIS 95 (Tenn. Crim. App., Nashville, Feb. 13, 1996); State v. William Ray Rhodes, No. 02C01-9406-CC-00124, 1995 Tenn. Crim. App. LEXIS 589 (Tenn. Crim. App., Jackson, July 19,1995); State v. Curtis Anthony Miller, No. 01-C-01-9309-CR-00329, 1994 Tenn. Crim. App. LEXIS 341 (Tenn. Crim. App., Nashville, June 2, 1994). However, the Tennessee Supreme Court has emphasized that the State bears the burden of proving that a victim's limitations render him or her particularly vulnerable. See State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997). "In determining whether the State has met its burden, the trial court must consider a number of factors and must make factual findings. It should consider whether evidence in the record with regard to the victim's age or physical and mental attributes demonstrated an inability to resist the crime, summon help, or testify at a later date." Id. at 97. Such evidence may be presented in the form of lay or expert testimony. See id.

In this case, although the trial court made factual findings concerning application of enhancement factor (4), we conclude that evidence supporting application of this factor is not included in the record. See Tenn. Code Ann. § 40-35-114(4). The physician who performed the autopsy on the victim in this case merely testified that the victim's blood alcohol level at the time of his death was 0.21 percent. No evidence was offered to show the effect that this amount of alcohol may have had on the victim's ability to resist the crime or to call for help. Without a further factual basis to support the trial court's findings, we must conclude that enhancement factor (4) was improperly applied in this case. See id. Nevertheless, in light of the other two enhancement factors that were properly applied and in light of the absence of mitigating factors, we conclude that a sentence of nine and a half years incarceration in this case is appropriate.

Accordingly, the judgment of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE